1 | DAVID L. NEALE (SBN 141225)
2 | JULIET Y. OH (SBN 211414)
3 | GWENDOLEN D. LONG (SBN 276443)
3 | LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
3 | 10250 Constellation Boulevard, Suite 1700
4 | Los Angeles, California 90067
4 | Telephone:  (310) 229-1234
5 | Facsimile:  (310) 229-1244
6 | Email:  dln@lnbyb.com, jyo@lnbyb.com, gdl@lnbyb.com

7 | Proposed Attorneys for Chapter 11 Debtors
7 | and Debtors in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| In re | ) Case No. 2:11-bk-44740-SK |
|---|---|
| MILBANK 505 SAM HOUSTON I, LLC, 505 SAM HOUSTON II, LLC, MILBANK 505 SAM HOUSTON III, LLC, MILBANK 505 SAM HOUSTON IV, LLC, and MILBANK 505 SAM HOUSTON V, LLC, | ) Joint Administration Pending With:<br>) Case No. 2:11-bk-44742<br>) Case No. 2:11-bk-44743<br>) Case No. 2:11-bk-44745<br>) Case No. 2:11-bk-44746<br>) Chapter 11 |
| Debtors. | |
| ___ Affects Milbank 505 Sam Houston I, LLC Only<br>___ Affects 505 Sam Houston II, LLC Only<br>___ Affects Milbank 505 Sam Houston III, LLC Only<br>___ Affects Milbank 505 Sam Houston IV, LLC Only<br>___ Affects Milbank 505 Sam Houston V, LLC Only<br> X  Affects All Debtors | **DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTORS TO USE CASH COLLATERAL ON AN INTERIM BASIS PENDING A FINAL HEARING; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:  [To be scheduled]<br>Time:  [To be scheduled]<br>Place: Courtroom "1575"<br>255 E. Temple Street<br>Los Angeles, California |

1

**SUMMARY**

Pursuant to Local Bankruptcy Rules 2081-1(a)(9), 4001-2 and 9075-1, 11 U.S.C. Section 363(c), and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), Milbank 505 Sam Houston I, LLC, a Delaware limited liability company ("505-I"), 505 Sam Houston II, LLC, a Delaware limited liability company ("505-II"), Milbank 505 Sam Houston III, LLC, a Delaware limited liability company ("505-III"), Milbank 505 Sam Houston IV, LLC, a Delaware limited liability company ("505-IV"), and Milbank 505 Sam Houston V, LLC, a Delaware limited liability company ("505-V," and collectively with 505-I, 505-II, 505-III and 505-IV, the "Debtors"), the debtors and debtors in possession in the above-captioned chapter 11 bankruptcy cases, hereby move, on an emergency basis (the "Motion"), for the entry of an order authorizing the Debtors to use cash collateral on an emergency interim basis pending a final hearing in accordance with the Debtors' joint operating budget (the "Budget"), a copy of which is attached as Exhibit "1" to the Declaration of M. Aaron Yashouafar (the "Yashouafar Declaration") filed concurrently herewith.

The Debtors filed voluntary petitions under Chapter 11 of 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") on September 5, 2011 (the "Petition Date"). The Debtors have filed concurrently herewith emergency motions seeking the joint administration of their chapter 11 bankruptcy cases. The Debtors continue to operate their businesses, manage their financial affairs and operate their bankruptcy estates as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

The Debtors together, as tenants in common, own the real property commonly known as 505 North Belt and located at 505 North Sam Houston Parkway East, Houston, Harris County, Texas (the "Property"). The Property is a six-story office building consisting of approximately 78,000 square feet. As set forth in the Memorandum of Points and Authorities and the Yashouafar Declaration filed concurrently herewith, the Debtors believe that the current fair market value of the Property, in as-is condition, is approximately $6,500,000.

On or about August 31, 2006, the Debtors' predecessor, 505 Atrium, L.P., a Texas limited partnership (the "Original Borrower"), entered into a loan agreement with Capmark Bank, a Utah industrial bank ("Capmark"), pursuant to which the Original Borrower obtained a loan from Capmark in the principal amount of $5,400,000 (the "Loan"). The obligations of the Original Borrower in connection with the Loan and related documents were secured by a Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing recorded against the Property (the "Deed of Trust"). On or about July 31, 2007, the Debtors purchased and acquired the Property (and other assets) and, in connection therewith, assumed the Loan and the obligations thereunder.

Shortly before the Petition Date, an entity called KRM 505 Sam Houston LLC, a Texas limited liability company (the "Lender"), purchased and acquired the Loan, Deed of Trust and related Loan documents at a substantial discount. The Lender asserts that it is currently owed in excess of $5,400,000 under the Loan, secured by the Property, the fixtures and personal property located at or on the Property, as well as the Debtors' cash, which is derived primarily, if not entirely, from rent received by the Debtors from their tenants. The Debtors dispute, among other things, the amount asserted by the Lender to be owed under the Loan.

The Debtors are not aware of any other liens that have been asserted against the Property or against the Debtors' cash and rent revenue.

The Debtors estimate that the Property will generate rent revenue of approximately $70,000 each month. The Debtors must be able to use the rent revenue generated from the lease of space in the Property to maintain the Property and pay operating expenses relating to the Property, including, among other things, insurance, utilities, parking, security services, janitorial services, tenant improvement costs and other operational costs associated with the Property. Without the ability to use cash collateral to pay the ongoing operating expenses of the Property, the Debtors will not be able to continue maintaining the Property, which will ultimately result in the loss of tenants and rent revenue, to the detriment of all parties in interest.

Pursuant to the Motion, the Debtors seek Court authority to use cash collateral in order to pay the expenses of maintaining and operating the Property in accordance with the Budget. In addition, the Debtors seek authority to use cash collateral to pay all quarterly fees owing to the Office of the United States Trustee and all expenses owing to the Clerk of the Bankruptcy Court. The Debtors also seek authority to deviate from the line items contained in the Budget by not more than 10%, on both a line item and aggregate basis, with any unused portions to be carried over into the following week(s). To ensure that cash collateral is available for the foregoing purposes, pursuant to the Motion, the Debtors seek an order of the Court directing tenants to pay all rent directly to the Debtors.

Given that the Lender is an oversecured creditor protected by a significant equity cushion (of approximately 20%) and given the Debtors' continued operation and maintenance of the Property, the Debtors submit that the Lender will remain adequately protected despite the Debtors' use of cash collateral pursuant to the terms proposed in the Motion. Additionally, the use of cash collateral is critical to the Debtors' ability to formulate and implement an effective reorganization strategy for the benefit of all creditors.

Pursuant to Bankruptcy Rule 4001(b)(2), while the Court cannot conduct a final hearing on the Motion earlier than fourteen (14) days after service of the Motion, the Court may conduct a preliminary hearing before such fourteen day period expires to enable the Debtors to use cash collateral as is necessary to avoid immediate and irreparable harm to the Debtors' estates pending a final hearing. The Debtors cannot risk any interruption in the use of their cash collateral, which is critical to maintaining and operating the Property. The Debtors must be able to pay expenses in accordance with the Budget pending a final hearing in order to avoid immediate and irreparable harm.

///
///
///
///

## ADDITIONAL INFORMATION

The relief sought in the Motion is based upon Local Bankruptcy Rules 2081-1(a)(9), 4001-2 and 9075-1, Section 363(c) of the Bankruptcy Code, and Bankruptcy Rules 4001 and 9014, this Motion, the annexed Memorandum of Points and Authorities, the Yashouafar Declaration and other declarations filed concurrently herewith in support of the Motion, the arguments and statements of counsel to be made at the hearing on the Motion, and any other evidence properly presented to the Court at or prior to the hearing on the Motion.

In order to provide maximum notice of this Motion, concurrently with the filing of this Motion with the Court (on September 7, 2011), the Debtors have served a copy of this Motion and all supportive papers (including notice of the hearing) upon the Office of the United States Trustee, all secured creditors and their counsel (if known), and the 20 largest unsecured creditors of each of the Debtors via overnight mail.  These parties will receive delivery of the Motion and all supportive papers by not later than the morning of September 8, 2011.  Any party wishing to object or be heard with respect to the Motion must appear at the hearing on the Motion.

**WHEREFORE**, the Debtors respectfully request that the Court enter an order:

(1)    affirming the adequacy of the Notice given herein;

(2)    granting the Motion on an interim basis pending a final hearing thereon;

(3)    authorizing the Debtors to use cash collateral to (i) pay all of the expenses set forth in the Budget, with authority to deviate from the line items contained in the Budget by not more than 10%, on both a line item and aggregate basis, with any unused portions to be carried over into the following week(s) and (ii) pay all quarterly fees owing to the Office of the United States Trustee and all expenses owing to the Clerk of the Bankruptcy Court;

(4)    directing tenants who are leasing space within the Property to pay all rent directly to the Debtors;

(5)    setting a final hearing on the Motion; and

///

///

(6)    granting such other and further relief as the Court deems just and proper under the circumstances.

Dated: September 7, 2011

MILBANK 505 SAM HOUSTON I, LLC,
505 SAM HOUSTON II, LLC,
MILBANK 505 SAM HOUSTON III, LLC,
MILBANK 505 SAM HOUSTON IV, LLC, and
MILBANK 505 SAM HOUSTON V, LLC

By: _____
DAVID L. NEALE
JULIET Y. OH
GWENDOLEN D. LONG
LEVENE, NEALE, BENDER, YOO
    & BRILL L.L.P.
Proposed Attorneys for Chapter 11
Debtors and Debtors in Possession

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    STATEMENT OF FACTS**

**A.    Background.**

1.    On September 5, 2011 (the "Petition Date"), Milbank 505 Sam Houston I, LLC, a Delaware limited liability company ("505-I"), 505 Sam Houston II, LLC, a Delaware limited liability company ("505-II"), Milbank 505 Sam Houston III, LLC, a Delaware limited liability company ("505-III"), Milbank 505 Sam Houston IV, LLC, a Delaware limited liability company ("505-IV"), and Milbank 505 Sam Houston V, LLC, a Delaware limited liability company ("505-V," and collectively with 505-I, 505-II, 505-III and 505-IV, the "Debtors"), the debtors and debtors in possession in the above-captioned chapter 11 bankruptcy cases, each filed a voluntary petition under Chapter 11 of 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code").  The Debtors are managing their financial affairs and operating their bankruptcy estates as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  The Debtors have filed concurrently herewith emergency motions seeking the joint administration of their chapter 11 bankruptcy cases.

2.    The Debtors together, as tenants in common, own the real property commonly known as 505 North Belt and located at 505 North Sam Houston Parkway East, Houston, Harris County, Texas (the "Property").  The Property is a six-story office building consisting of approximately 78,000 square feet.

3.    On or about August 31, 2006, the Debtors' predecessor, 505 Atrium, L.P., a Texas limited partnership (the "Original Borrower"), entered into a loan agreement with Capmark Bank, a Utah industrial bank ("Capmark"), pursuant to which the Original Borrower obtained a loan from Capmark in the principal amount of $5,400,000 (the "Loan").  A true and correct copy of the Loan agreement is attached as Exhibit "2" to the Declaration of M. Aaron Yashouafar (the "Yashouafar Declaration") filed concurrently herewith.

4.    On or about August 31, 2006, a Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing relating to the Property was recorded with the Harris County Clerk's Office in favor of Capmark (the "Deed of Trust").  A true and correct copy of the

Deed of Trust is attached as Exhibit "3" to the Yashouafar Declaration filed concurrently herewith. In addition, on or about May 30, 2007, an Assignment of Leases and Rents relating to the Property was recorded with the Harris County Clerk's Office in favor of Capmark (the "Assignment"). A true and correct copy of the Assignment is attached as Exhibit "4" to the Yashouafar Declaration filed concurrently herewith. As a result, the obligations of the Original Borrower in connection with the Loan were secured by the Property, the rents generated by the Property, and other assets related to the Property.

5. The Loan, Deed of Trust, Assignment and other related Loan documents were subsequently assigned to Wells Fargo Bank, N.A., as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2007-C1 ("Wells Fargo").

6. On or about July 31, 2007, the Debtors purchased and acquired the Property (and other assets) and, in connection therewith, assumed the Loan and the obligations thereunder in accordance with that certain Deed of Trust, Note and Other Loan Document Assumption and Release Agreement (the "Assumption Agreement"). A true and correct copy of the Assumption Agreement is attached as Exhibit "5" to the Yashouafar Declaration filed concurrently herewith.

7. A few weeks before the Petition Date, an entity called KRM 505 Sam Houston LLC, a Texas limited liability company (the "Lender") purchased and acquired the Loan, Deed of Trust, Assignment and other related Loan documents from Wells Fargo. It is the Debtors' understanding that the Lender purchased the Loan, Deed of Trust, Assignment and other related Loan documents, at a substantial discount, for the purchase price of approximately $2,750,000. It is also the Debtors' understanding that the Lender asserts it is currently owed in excess of $5,400,000 under the Loan, secured by the Property, the fixtures and personal property located at or on the Property, as well as the Debtors' cash, which is derived primarily, if not entirely, from rent received by the Debtors from their tenants. The Debtors dispute, among other things, the amount asserted by the Lender to be owed under the Loan.

8.    Following their acquisition of the Property, the Debtors entered into a property management agreement (the "<u>Management Agreement</u>") with Milbank Real Estate Services ("<u>Milbank</u>"), pursuant to which Milbank acts as the Debtors' exclusive managing agent for the Property. In accordance with the Management Agreement, Milbank, among other things, procures and negotiates lease agreements with tenants for the Property, collects rents from tenants in the Property and disburses funds to pay the operating expenses related to the Property.

9.    During the course of the Debtors' ownership of the Property, the Debtors have invested a considerable amount of money towards the maintenance and upgrading of the Property. As a result, the Property has remained competitive with other properties in the area.

10.    Commencing in or about September, 2008, following the aftermath of Hurricane Ike, the Debtors started to experience an increase in delinquencies from tenants in the Property, as well as an increase in vacancies in the Property. Despite ongoing efforts to enhance marketing and leasing efforts in connection with the Property and implement a more stringent collection process, the delinquencies and vacancies continued to increase, particularly with the worsening economy. Notwithstanding the loss of income associated with the Property, the Debtors and their principals continued investing in the Property to ensure that the payments required under the Loan were timely made.

11.    In or about July, 2010, the Debtors and their principals were no longer able to continue contributing funds to offset the operating losses of the Property and, as a result, the Debtors became delinquent in their obligations under the Loan.

12.    On or about August 15, 2011, the Lender provided the Debtors with notice that the Loan had been accelerated, was due in full, and that the Lender intended to proceed with a non-judicial foreclosure of the Property on September 6, 2011. Although the Debtors had successfully negotiated resolutions of their disputes with Wells Fargo in the past, the Debtors were unsuccessful in negotiating a consensual resolution with their current Lender.

13.    As a result of the foregoing, the Debtors sought protection under Chapter 11 of the Bankruptcy Code to avoid foreclosure of the Property, to continue operating the Property in an

effective and cost-efficient manner, to preserve and maximize the value of the Property, and to have the ability and opportunity to sell or refinance the Property, all of which will allow the Debtors to repay the Loan and their other debts for the benefit of all creditors.

**B.     Description Of The Debtors' Assets And Debts.**

14.    <u>The Property</u>.  The primary assets of the Debtors' bankruptcy estates consist of the Property and the fixtures and personal property located at or on the Property.  Based upon the experience and knowledge of the local commercial real estate market held by M. Aaron Yashouafar, the President and authorized representative of each of the Debtors, the Debtors believe that the current value of the Property is approximately $6,500,000.

15.    <u>Lender Debt</u>.  The Debtors' primary creditor is the Lender.  The Debtors believe that the Lender currently holds a claim in the approximate sum of $5,400,000.  As noted above, the obligations of the Debtors in connection with the Loan are secured by the Deed of Trust, pursuant to which the Lender asserts liens against the Property, the fixtures and personal property located at or on the Property, as well as the Debtors' cash, which is derived primarily, if not entirely, from rent received by the Debtors from their tenants.  The Debtors are not aware of any other liens that have been asserted against the Property or against the Debtors' cash and rent revenue.

16.    <u>Unsecured Debt</u>.  In addition to the debts described above, together the Debtors have a total of approximately $200,000 of unsecured debt.

**C.     The Need For Use Of Cash Collateral And Proposed Operating Budget.**

17.    A copy of the Debtors' joint operating budget for the period from the Petition Date through and including October 31, 2011 (the "<u>Budget</u>") is attached as Exhibit "1" to the Yashouafar Declaration filed concurrently herewith.  The Budget reflects rent revenue totally approximately $70,000 in the month of September, 2011 and approximately $70,000 in the month of October, 2011, which is expected to be generated by the Property, and the expenses expected to be incurred to maintain and operate the Property, including, among other things, insurance, utilities, parking, security services, janitorial services, tenant improvement costs and other operational costs associated with the Property.

18. Without the ability to use cash collateral to pay the ongoing operating expenses of the Property, the Debtors and Milbank will not be able to continue maintaining the Property, which will ultimately result in the loss of tenants and rent revenue.

19. Pursuant to the Motion, the Debtors seek Court authority to use cash collateral in order to pay the expenses of maintaining and operating the Property in accordance with the Budget. In addition, the Debtors seek authority to use their cash collateral to pay all quarterly fees owing to the Office of the United States Trustee and all expenses owing to the Clerk of the Bankruptcy Court. The Debtors also seek authority to deviate from the line items contained in the Budget by not more than 10%, on both a line item and aggregate basis, with any unused portions to be carried over into the following week(s).

20. It is the Debtors' understanding that the Lender previously sent letters to tenants who are leasing space within the Property instructing such tenants to pay rent directly to the Lender (rather than to Milbank or the Debtors). To ensure that cash collateral is available for the purposes set forth in this Motion – *i.e.*, to pay the expenses of maintaining and operating the Property in accordance with the Budget, to pay all quarterly fees owing to the Office of the United States Trustee and to pay all expenses owing to the Clerk of the Bankruptcy Court – by this Motion, the Debtors seek an order of the Court directing tenants to pay all rent directly to the Debtors.

## II. DISCUSSION

**A. The Debtors Must Be Authorized To Use Cash Collateral To Operate, Maintain And Preserve The Property In Accordance With The Budget.**

The Debtors' use of property of their estates is governed by Section 363 of the Bankruptcy Code. Section 363(c)(l) provides in pertinent part:

> If the business of the debtor is authorized to be operated under section. . .1108. . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C.§ 363(c)(l). A debtor in possession has all of the rights and powers of a trustee with

11

respect to property of the estate, including the right to use property of the estate in compliance with Section 363. *See* 11 U.S.C. §1107(a).

"Cash collateral" is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest. . . ." 11 U.S.C. §363(a). Section 363(c)(2) establishes a special requirement with respect to "cash collateral," providing that the trustee or debtor in possession may use "cash collateral" under subsection (c)(l) if:

> (A) each entity that has an interest in such cash collateral consents; or
> (B) the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

See 11 U. S.C. §363(c)(2)(A) and (B).

It is well settled that it is appropriate for a Chapter 11 debtor to use cash collateral for the purpose of maintaining and operating its property. 11 U.S.C. § 363(c)(2)(B); *In re Oak Glen R-Vee*, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); *In re Tucson Industrial Partners*, 129 B.R. 614 (9th Cir. BAP 1991). In addition, where the debtor is operating a business, it is extremely important that the access to cash collateral be allowed in order to facilitate the goal of reorganization: "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash collateral is necessary to operate a business." *In re Dynaco Corporation*, 162 B.R. 389 (Bankr. D.N.H. 1993), *quoting In re Stein*, 19 B.R. 458, 459. (Bankr. E.D. Pa. 1982).

The only current source of revenue available to the Debtors to use to maintain and operate the Property is the rent revenue being generated by the Property. If the Debtors are not permitted to use their cash collateral to maintain and operate the Property, it is all but certain that the Debtors' existing tenants will leave, taking with them all of the revenue that the Property is currently generating.

The operating expenses that the Debtors must be able to pay during the approximately 60-day period following the Petition Date are set forth in the Budget. For the reasons noted above, the Debtors' inability to pay these operating expenses would cause immediate and irreparable harm to the Debtors and their bankruptcy estates. In addition to the foregoing

1  expenses, the Debtors seek authority to use cash collateral to pay all quarterly fees owing to the
2  Office of the United States Trustee and all expenses owing to the Clerk of the Bankruptcy Court.
3  The Debtors also seek authority to deviate from the line items contained in the Budget by not
4  more than 10%, on both a line item and aggregate basis, with any unused portions to be carried
5  over into the following week(s).  To ensure that cash collateral is available for the foregoing
6  purposes, pursuant to the Motion, the Debtors seek an order of the Court directing tenants to pay
7  all rent directly to the Debtors.

**B.    The Lender Is Adequately Protected By A Sufficient Equity Cushion And The Debtors' Continued Operation Of The Property.**

To the extent that an entity has a valid security interest in the revenues generated by property, those revenues constitute "cash collateral" under Section 363(a) of the Bankruptcy Code.  Pursuant to Section 363(c)(2), the Court may authorize the debtor to use a secured creditor's cash collateral if the secured creditor is adequately protected.  *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984).  *See also In re O'Connor*, 808 F.2d 1393, 1398 (10th Cir. 1987); *In re McCombs Properties VI, Ltd.*, 88 B.R. 261, 265 (Bankr. C.D. Cal. l988) ("*McCombs*").

Pursuant to the Supreme Court case of *United Savings Association v. Timbers of Inwood Forest Associates*, 108 S.Ct. 626, 629 (1988) ("*Timbers*") and subsequent case law, the property interest that a debtor must adequately protect pursuant to Sections 361(1) and (2) of the Bankruptcy Code is only the value of the lien that secures the creditor's claim.  *Timbers*, 108 S.Ct. at 630.  *See also McCombs, supra*, at 266.  Section 506(a) "limit[s] the secured status of a creditor (i.e., the secured creditor's claim) to the lesser of the [allowed amount of the] claim or the value of the collateral."  *McCombs* at 266.

The Ninth Circuit made clear in *Mellor*, 734 F.2d at 1401, that in the case of an oversecured creditor, an equity cushion of 20% is considered clear adequate protection of a secured creditor's interest in cash collateral.  *See also, In re McGowan*, 6 B.R. 241, 243 (Bankr. E.D. Pa. 1980) (holding a 10% cushion is sufficient to be adequate protection); *In re Rogers Development Corp.*, 2 B.R. 679, 685 (Bankr. E.D. Va. 1980) (court decided that an equity

cushion of approximately 15% to 20% was sufficient adequate protection to the creditor, even though the debtors had no equity in the property).

Here, the Lender is oversecured and adequately protected by a significant equity cushion. As discussed above, the current estimated value of the Property is approximately $6,500,000. The current amount of the Lender's claim is approximately $5,400,000. Accordingly, the Lender is secured by an equity cushion of approximately 20%, which is consistent with the equity cushion that the Ninth Circuit held in *Mellor* constitutes clear adequate protection of a secured creditor's interest in cash collateral.

Additionally, the law is also clear that the preservation of the value of a secured creditor's lien is sufficient to provide adequate protection to a secured creditor when a debtor seeks to use cash collateral. *In re Triplett*, 87 B.R. 25 (Bankr. W.D.Tex. 1988). *See also In re Stein*, 19 B.R. 458 (Bankr. E.D.Pa. 1982). The *Stein* Court determined that the use of cash collateral was necessary to the continued operations of the debtor, and that the creditor's secured position could only be enhanced by the continued operation of the debtor's business. *See also, In re McCombs*, supra, where the court determined that the debtor's use of cash collateral for needed repairs, renovations and operating expenses eliminated the risk of diminution in the creditor's interest in the cash collateral and such use would more likely increase cash collateral.

As reflected in the Budget, the Debtors' continued operation and maintenance of the Property will adequately protect the Lender (and any other secured creditors) as the Debtors will continue to generate revenue and preserve the value of the Property. Other Courts have determined that the Debtors' continued business operations can constitute the adequate protection of a secured creditor. *See Matter of Pursuit Athletic Footwear, Inc.,* 193 B.R. 713 (Bankr. D. Del. 1996); *In re Newark Airport/Hotel Ltd. Partnership*, 156 B.R. 444, 450 (Bankr. D.N.J. 1993); *In re Dynaco*, 162 B.R. 389, 394-5 (Bankr. D.N.H. 1993); *In re Immenhausen Corp.*, 164 B.R. 347, 352 (Bankr. M.D. Fla. 1994).

Additionally, in determining adequate protection, Courts have stressed the importance of promoting a debtor's reorganization. In *In re O'Connor*, *supra*, the Tenth Circuit stated:

14

> "In this case, Debtors, in the midst of a Chapter ll proceeding, have proposed to deal with cash collateral for the purpose of enhancing the prospects of reorganization. This quest is the ultimate goal of Chapter 11. Hence, the Debtor's efforts are not only to be encouraged, but also their efforts during the administration of the proceeding are to be measured in light of that quest. Because the ultimate benefit to be achieved by a successful reorganization inures to all the creditors of the estate, a fair opportunity must be given to the Debtors to achieve that end. Thus, while interests of the secured creditor whose property rights are of concern to the court, the interests of all other creditors also have bearing upon the question of whether use of cash collateral shall be permitted during the early stages of administration."

808 F.2d at 1937.

The use of cash collateral is critical to the Debtors' ability to implement an effective reorganization strategy for the benefit of all creditors. As demonstrated herein, the use of the Debtors' cash collateral, in accordance with the Budget, will preserve and maximize the Debtors' primary assets (essentially, the Property and the fixtures and personal property located on or at the Property) for the benefit of the estates and the Debtors' creditors. If the Debtors are not permitted to use cash collateral to maintain and operate the Property, the Debtors will very likely lose their existing tenants and will have no ability to obtain new replacement tenants. The very source of the Debtors' cash collateral – namely, the rent generated by the lease of space in the Property – will evaporate, and the Debtors will be left with a vacant Property. On the other hand, if the Debtors are authorized to use their cash collateral, the Debtors will be able to continue maintaining the Property and generating cash flow so that the Debtors can simultaneously pursue longer term strategies for the restructuring of their financial affairs, including, without limitation, the further leasing of space in the Property, the refinancing of the Property, or the sale of the Property. Clearly, the use of cash collateral will only enhance the prospect of the Debtors' reorganization.

**C.    Procedural Requirements Regarding Approval Of The Motion Have Been Satisfied.**

Rules 4001(b) and 4001(c) of the Federal Rules of Bankruptcy Procedure ("<u>Bankruptcy Rules</u>") set forth procedural requirements for obtaining use of cash collateral. There are three general procedural requirements. First, the Motion must contain a copy of the proposed form of order granting the Motion, which has been done by attaching the proposed order as Exhibit "6"

to the Yashouafar Declaration filed concurrently herewith. Second, the Motion must provide a concise statement of the relief requested, which was done above. Third, the Motion is required to be served on any entity with an interest in the Debtors' cash collateral, any committee appointed or the twenty largest unsecured creditors if there is no committee, and on such other parties as the Court directs. Here, the Debtors have served a copy of the Motion and all supportive papers upon the Office of the United States Trustee, all known secured creditors and their counsel (if known), the twenty largest unsecured creditors of each of the Debtors, and parties requesting special notice via overnight mail. These parties will receive delivery of the Motion and all supportive papers by not later than the morning of September 8, 2011. Accordingly, the Motion complies with the requirements of Bankruptcy Rules 4001(b) and 4001(c).

In addition, in accordance with Bankruptcy Rule 4001(c)(1)(B) and Local Bankruptcy Rule 4001-2, the Debtors submit that the relief requested by the Debtors pertaining to the Debtors' use of cash collateral does not contain any of the following provisions:

| **Provision** | |
|---|---|
| Cross-collateralization clauses | No |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the validity, perfection or amount of the secured party's pre-petition lien or debt or the waiver of claims against the secured creditor. | No |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the relative priorities of the secured party's pre-petition lien. | No |
| Provisions that operate, as a practical matter, to divest the Debtor of any discretion in the formulation of a plan or administration of the estate or to limit access to the court to seek any relief under other applicable provision of law. | No |
| Waivers of 11 U.S.C. § 506(c), unless the waiver is effective only during the period in which the Debtor is authorized to use cash collateral or borrow funds. | No |
| Releases of liability for the creditor's alleged prepetition torts or breaches of Contract. | No |

| **Provision** | |
|---|---|
| Waivers of avoidance actions arising under the Bankruptcy Code. | No |
| Provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt | No |
| Provisions that provide disparate treatment for the professionals retained by a creditors' committee from that provided for the professionals retained by the Debtor with respect to a professional fee carve out | No |
| Provisions that prime any secured lien | No |
| Automatic relief from the automatic stay upon default, conversion to chapter 7, or appointment of a trustee. | No |
| Waivers of procedural requirements, including those for foreclosure mandated under applicable non-bankruptcy law, and for perfection of replacement liens. | No |
| Adequate protection provisions which create liens on claims for relief arising under 11 U.S.C. §§ 506(c), 544, 545, 547, 548 and 549. | No |
| Waivers, effective on default or expiration, of the Debtor's right to move for a court order pursuant to 11 U.S.C. § 363(c)(2)(B) authorizing the use of cash collateral in the absence of the secured party's consent | No |
| Provisions that grant a lien in an amount in excess of the dollar amount of cash collateral authorized under the applicable cash collateral order. | No |
| Provisions providing for the paying down of prepetition principal owed to a creditor. | No |
| Findings of fact on matters extraneous to the approval process. | No |

## III.  CONCLUSION

**WHEREFORE**, the Debtors respectfully request that the Court enter an order:

(1) affirming the adequacy of the Notice given herein;

(2) granting the Motion on an interim basis pending a final hearing thereon;

(3) authorizing the Debtors to use cash collateral to (i) pay all of the expenses set forth in the Budget, with authority to deviate from the line items contained in the Budget by not more than 10%, on both a line item and aggregate basis, with any unused portions to be carried

over into the following week(s) and (ii) pay all quarterly fees owing to the Office of the United States Trustee and all expenses owing to the Clerk of the Bankruptcy Court;

  (4) directing tenants who are leasing space within the Property to pay all rent directly to the Debtors;

  (5) setting a final hearing on the Motion; and

  (6) granting such other and further relief as the Court deems just and proper under the circumstances.

Dated: September 7, 2011

MILBANK 505 SAM HOUSTON I, LLC,
505 SAM HOUSTON II, LLC,
MILBANK 505 SAM HOUSTON III, LLC,
MILBANK 505 SAM HOUSTON IV, LLC, and
MILBANK 505 SAM HOUSTON V, LLC

By: *[signature: Juliet Oh]*
  DAVID L. NEALE
  JULIET Y. OH
  GWENDOLEN D. LONG
  LEVENE, NEALE, BENDER, YOO
   & BRILL L.L.P.
  Proposed Attorneys for Chapter 11
  Debtors and Debtors in Possession